**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF ALASKA**

| | |
|---|---|
| In re:<br><br>AQUA PESCA, LLC,<br><br>              Debtor. | Case No. 17-00065-GS<br><br>Chapter 7 |

## MEMORANDUM DECISION ON TRUSTEE'S APPLICATION TO DISBURSE PROCEEDS FROM SALE OF LIQUOR LICENSE

    The court previously approved the chapter 7 trustee's (Trustee) sale of a beverage dispensary license (License) for $175,000.[1] The Trustee is holding the proceeds from the sale, and filed his Application to Disburse Proceeds from Sale of Liquor License (Application) seeking authorization to distribute the sale proceeds pro-rata to various creditors asserting "holds" against the License.[2] The Application originally drew several objections.[3] The Trustee has resolved all but the debtor's objection.[4]

    A fundamental problem remains: no holds were filed prior to the sale of the License. Valid holds against an Alaska liquor license have traditionally been treated akin to a perfected secured interest in that license, such that those holds are paid directly from the sale proceeds. It appears that confusion arose as a result of the efforts of the prior owner to recover the License, which process was ultimately co-opted by the Trustees's voluntary sale to Gene Minden, the sole shareholder of the prior owner of the License. Regardless of the reason, the court cannot approve a distribution to creditors that may have held valid holds against the License, but who never actually filed the holds. For this reason the court must deny the Application.

---

[1] ECF No. 34.

[2] ECF No. 38.

[3] *See* ECF Nos. 39; 41-43.

[4] ECF No. 44.

A.      BACKGROUND

   1.      **Pre-petition Events.**

On April 27, 2012, the debtor purchased a restaurant and bar business located in Seward, Alaska from Fam Alaska, Inc. (Fam). As part of the sale, the debtor acquired the associated License from Fam,[5] and entered into a lease agreement with Fam for the real property where the restaurant was located (Lease).[6] To secure repayment, Fam took a security interest in certain property purchased by the debtor, including the License.[7] The debtor executed a Security Agreement that provided that in the event of default, including delinquent Lease payments exceeding one month's rent, the License would be "immediately" transferred back to Fam.[8] Fam recorded a UCC Financing Statement in the central recorders' office to perfect its security interest in the License and other property.[9]

The debtor defaulted under the terms of its agreements with Fam in September 2016, and ceased operations in January 2017. Fam terminated the Lease and repossessed the real property.[10] On February 27, 2017, the debtor commenced this voluntary chapter 7 bankruptcy case.

   2.      **Fam's Post-Petition Collection Efforts.**

On February 18, 2017, Gene Minden, owner of Fam, signed a Form AB-01 Transfer License Application (Transfer Application) in preparation of initiating an involuntary transfer of the License back to FAM.[11] Under 3 AAC 304.107, an unpaid seller holding a security interest in a liquor license may recover the liquor license by way of an involuntary transfer if (1) the sale contract was "recorded in the manner provided for recordation of real estate conveyances" and

---

[5] ECF No. 21-1 at p. 1.

[6] ECF No. 17-2.

[7] ECF No. 21-2 at p. 1.

[8] *Id.*

[9] ECF No. 21-3.

[10] ECF No. 21 at p. 2.

[11] ECF No. 43-1 at p. 2.

2

the seller, at the time of transfer, made a UCC filing statement claiming a security interest in the liquor license; (2) all documents pertaining to the transfer of the liquor license were filed with AMCO at the time of transfer; and (3) notice of the transfer was made in writing and published "once a week for three weeks in a newspaper of general circulation before the transfer."[12]

While Minden signed the Transfer Application pre-petition, the document reflects that AMCO did not receive the Transfer Application until after Aqua Pesca filed its bankruptcy.[13] Minden undertook a number of actions required by AMCO to recover the License from Aqua Pesca. As a result of Minden's efforts, AMCO sent written notices to the debtor's creditors that it had received an application for transfer of the License, and asking whether the creditors objected to the transfer.[14]

### 3. The Motion to Sell the License.

On May 31, 2017, well after filing its Transfer Application, Fam filed a motion for relief from the automatic stay to pursue the retransfer of the License (Stay Relief Motion).[15] In its motion, Fam stated that it was "now seeking relief from stay as to the License so that it can apply to the Alcoholic Beverage Control Board for retransfer of the License."[16] Fam attached a letter from AMCO dated May 25, 2017, acknowledging receipt of Fam's transfer application and

---

[12] 3 AAC 304.107.

[13] *Id.* The notary block indicates that the document was notarized in Arizona. While the record demonstrates when Minden signed the Transfer Application and when AMCO received the Transfer Application, it is unclear when the Transfer Application was submitted. Fam contends that the Transfer Application was submitted pre-petition, *i.e.*, before February 27, 2017. Although the majority of the actual Transfer Application has not been submitted, the submission letter addressed to Shilo Senquiz at AMCO is dated March 7, 2017, and both the letter and the single page of the Transfer Application included in ECF No. 43-1 bear AMCO's receipt stamp dated March 10, 2017.

[14] ECF No. 43-1 at pp. 4-9; 11; 13; 15.

[15] ECF No. 21.

[16] *Id.* at 2.

3

advising that the application was complete.[17] The Stay Relief Motion did not disclose that Fam had been attempting to procure the transfer since March.[18]

Both the debtor and the Trustee opposed the Stay Relief Motion, challenging the validity of Fam's security interest based upon Fam's failure to record the lease or purchase agreement.[19] The Trustee further argued that the May 25, 2017 letter Fam received from AMCO confirming completion of the Transfer Application "says nothing, and means nothing, with respect to the perfection issue; all it shows is that Fam may itself be violating the automatic stay by continuing to pursue retransfer of the [L]icense."[20] The debtor attached to its opposition a March 30, 2017 letter sent by its counsel to Shilo Senquiz at AMCO, notifying Senquiz of the debtor's pending bankruptcy and pointing out that Fam did not record the lease.[21] The debtor further asserted that "[a]ny further effort by [Fam] to obtain...retransfer [of the License] without first obtaining an order for relief from the stay could be considered an intentional violation of § 362."[22] The Kenai Peninsula Borough also objected to the Stay Relief Motion, requesting that any transfer of the License be conditioned upon payment of delinquent taxes and interest owed.[23] A hearing on the Stay Relief Motion was set for June 28, 2017.[24]

On June 27, 2017, the day before the hearing on the Stay Relief Motion, the Trustee filed his Motion to Sell Liquor License, and Other Business Assets, Free and Clear of Liens (Sale Motion).[25] The Trustee proposed to sell the License to Gene Minden, Fam's president, for

---

[17] ECF No. 21-4.

[18] The Stay Relief Motion did, however, disclose that "Before the filing of this bankruptcy case Fam Alaska applied for retransfer of the license." ECF No. 21 at p. 3.

[19] *See* ECF Nos. 23, 27.

[20] ECF No. 27 at p. 3.

[21] ECF No. 23-1.

[22] *Id.* at p. 1.

[23] ECF No. 26.

[24] ECF No. 24.

[25] ECF No. 28.

4

$175,000, "in large part to avoid the time, risk, and expense associated with litigating the issue of perfection of the License before this [c]ourt and/or [AMCO]."[26]  The purchase and sale agreement attached to the Sale Motion as Exhibit A (PSA) provided, at paragraph 4, that it was subject to approval of the Bankruptcy Court.[27]  The PSA also provided that transfer of the License to Fam was subject to AMCO's approval, and that upon deposit of the purchase funds, the Trustee would "support or seek immediate [AMCO] conveyance to Fam of a temporary license."[28]  The signatures of the parties to the PSA were dated June 26 and 27, 2017.[29]

The PSA expressly did not address the amount of Fam's hold within the meaning of AS 04.11.360(4).[30]  In the Sale Motion, the Trustee explained that the amount of Fam's hold was not addressed by the PSA because "the [d]ebtor...is not a party to the PSA, and the Trustee did not wish to have the hold issue slow down the sale of the License itself."[31]  Instead, the proposed order attached to the Sale Motion provided that either this court or AMCO would determine the amount of creditor holds on the License, analogizing the determination to the claims allowance process in bankruptcy.[32]

Finally, the Sale Motion pointed out that per AS 04.11.340(4), a transfer of a liquor license will be denied unless all holds are paid or security arrangements satisfactory to the creditors are made.[33]  The Trustee represented that "[long] established practice is that this requirement is met when all taxing authorities, and other creditors, received the same pro-rata

---

[26] ECF No. 28 at p. 3.

[27] *Id*. at p. 9, para. 4.

[28] *Id.* at p. 9, para. 6.

[29] *Id.* at p. 10.

[30] *Id.* at p. 9, para. 7.  A "hold" within the meaning of AS 04.11.360(4) is a debt or tax "arising from the conduct of the business licensed under this title."

[31] *Id.* at p. 4.

[32] *Id*. at p. 4, n.2 ("Determination of a creditor's hold amount does not appear, to the Trustee, to be an issue that the Board is likely to desire to adjudicate...whereas determination of a hold amount is similar to the claims allowance process that this [c]ourt engages in on a regular basis.").

[33] *Id.* at p. 5.

5

distribution on their hold amounts, net of a carveout for administrative costs related to the sale."[34] The PSA included a carveout of $25,000 for administrative expenses, and Fam's consent to receipt of its pro-rata share of its to-be-determined hold amount.[35]

The Trustee moved to have the Sale Motion heard on shortened time.[36] The day after the Trustee filed his Sale Motion, June 28, 2017, the court held the preliminary hearing on the Stay Relief Motion. In light of the pending Sale Motion, the court continued the hearing on relief from stay until July 14, 2017, granted the motion to shorten time to consider the Sale Motion, and set the hearing on the Sale Motion for July 14, 2017.[37]

Despite these actions in this court, Fam's involuntary transfer process continued. By the time the Trustee discovered Fam's post-petition efforts to recover the License, AMCO had already sent out its letters to Aqua Pesca's creditors asking if the creditors objected to the transfer. No creditors filed any opposition to Fam's Transfer Application with AMCO.[38] On June 28, 2017, the same day as the relief from stay hearing and a day after the Trustee filed his Sale Motion, AMCO temporarily approved the Transfer Application, pending final approval.[39]

On July 11, 2017, AMCO approved the transfer of the License to Fam.[40]

Three days *after* AMCO approved the transfer to FAM, this court held a continued hearing on the Stay Relief Motion and Sale Motion. The court entered its order approving the

---

[34] *Id.*

[35] *Id.* at p. 9, para. 8.

[36] ECF No. 29.

[37] ECF No. 31.

[38] ECF No. 43-1 at p. 15. Only one creditor, Precision Construction, responded to AMCO. Kenai Peninsula Borough (KPB) (ECF No. 26) filed a limited opposition to Fam's motion for relief from the automatic stay (ECF No. 21), in which the Borough expressed its view that filing a protest of the license transfer with AMCO could be an action prohibited by 11 U.S.C. § 362(a)(6). Thus, the Borough filed its opposition to the transfer with this court rather than with AMCO.

[39] ECF No. 43-1 at p. 17. The temporary approval stated that "[a]ll statutory requirements have been fulfilled, there is no protest under AS 04.11.480, and no objections under AS 04.11.470 have been received."

[40] ECF No. 43-1 at p. 18. Minden did disclose on the record at the hearing on the Sale Motion that the transfer was approved on July 11, 2017.

6

sale of the License to Minden (Sale Order) that same day.[41]  The Sale Order expressly stated that the sale was subject to AMCO's approval, and directed that "[b]oth parties shall take such steps as are necessary or appropriate to obtain that approval."[42]  The Sale Order further provided that the court: (1) retained jurisdiction to determine the amount of a "hold" on the liquor license allegedly held by Fam; and (2) deemed AS 04.11.360(4) satisfied by the pro-rata distribution scheme (net of a $25,000 carveout for administrative expenses) proposed in the Sale Motion.[43]  Both of these provisions were contingent upon AMCO's consent to this court's determination of those issues when AMCO approved the sale.[44]

    **4.**    **The Application to Disburse Sale Proceeds**

On December 1, 2017, the Trustee filed the Application, seeking to distribute the $150,000 in post-carveout sale proceeds (Sale Proceeds) to the debtor's creditors pro-rata.[45]  The Trustee references AMCO's approval of the sale of the License in the Application but no evidence of AMCO's approval of the sale was provided.[46]  In the Application the Trustee revealed that no holds were filed by any creditors prior to the transfer of the License to Fam.[47]  *After* the transfer, Fam allegedly filed a hold in the amount of $1,525,831.  The debtor is said to also have filed a hold after the sale on behalf of the Internal Revenue Service (IRS) in the amount of $424,225.69.[48]  In his Application, the Trustee proposed a pro-rata distribution to the

---

[41] ECF No. 34.

[42] ECF No. 34 at p. 1, para. 1.

[43] *Id.* at p. 2, paras. 3, 5.

[44] *Id.* ("[*U*]*nless* [AMCO] indicates, when it approves the sale of the License, that the board desires to adjudicate the hold issues....*unless* [AMCO] indicates to the contrary when it approves the sale of the License.").

[45] ECF No. 38.

[46] *Id.* at p. 2 ("When [AMCO] approved the sale of the License, the board did not indicate that it desired to adjudicate the hold issues....").

[47] *Id.*

[48] *Id.* at p. 3.

7

debtor's creditors based upon an unsigned affidavit filed by Minden with AMCO detailing the names of the creditors holding accounts payable and outstanding taxes and the amounts owed.[49]

Multiple objections to the Application were filed. Fam and the KPB objected only to the calculation of the amounts they were to be paid under the Trustee's proposed distribution.[50] The objection filed by the IRS was more complicated; it asserted that its federal tax liens are superior to the claims of any unsecured creditors and argued that it should be paid prior to any pro-rata distributions to unsecured creditors.[51]

The debtor also opposed the Application, arguing that because the License was transferred to Fam via AMCO's involuntary retransfer process any holds were extinguished when the transfer was approved.[52] The debtor emphasized that no holds were filed prior to the transfer taking place.[53] Thus, the debtor concluded, the Sale Proceeds should be distributed pursuant to their priorities under the Bankruptcy Code and the Perishable Agricultural Commodities Act rather than pro-rata amongst those creditor now being designated as holds.[54]

The hearing on the Application was noticed for January 10, 2018.[55] The Trustee filed a supplemental memorandum in support of his Application on January 8, 2018.[56] In the supplement the Trustee first addressed the discrepancies regarding the amounts owed Fam and the KPB as part of a revised statement of total amounts owed.[57]

---

[49] *Id.* at pp. 3, 8.

[50] ECF Nos. 39, 42.

[51] *See* ECF No. 41.

[52] ECF No. 43.

[53] *Id.* at p. 8.

[54] *Id.* at p. 10.

[55] ECF No. 40.

[56] ECF No. 44.

[57] *Id.* at p.3.

The Trustee then countered the IRS's arguments regarding the priority of its liens with a copy of a March 8, 2017 letter addressed to Minden from the IRS, in which the agency proposed to issue a certificate discharging the License from the tax liens upon the IRS's receipt of evidence demonstrating that the debtor was "divested of rights, title, or interest" in the License.[58] The "conditional commitment" to discharge the IRS liens provided that it was valid for 30 days, and would be automatically revoked if the evidence requested was not received prior to expiration of the 30-day period (or another agreed date).[59]

The Trustee further "adhere[d] to his position that the expectations of the parties in this case, as well as the standard of practice in this jurisdiction generally, is that the [Sale Proceeds] would be distributed pro-rata to the taxing authorities and creditors with allowed holds."[60]

At the January 10, 2018 hearing on the Application, the IRS agreed on the record to the pro-rata distribution proposed by the Trustee, effectively withdrawing its opposition.[61] The court raised its concern that the Trustee was attempting to adjudicate claims via a proposed distribution outside the regular distribution process for chapter 7 estates. At Fam's request, the court granted the parties an opportunity to submit further briefing on the proposed distribution.

On January 22, 2018, Fam filed its supplemental memorandum in support of the Application (Supplement).[62] For the first time Fam objected to the debtor's standing to challenge the Application. It encouraged the court to view the Trustee's proposed distribution as a compromise.[63] Minden's declaration attached to Fam's Supplement included evidence demonstrating that he began advertising for the involuntary transfer pre-petition. Fam argued

---

[58] *Id.* at pp. 4, 15-16.

[59] *Id.* at p. 16.

[60] *Id.* at p. 4.

[61] January 10, 2018 Hearing at 2:44-2:56, ECF No. 46.

[62] ECF No. 47.

[63] *Id.* at pp. 1-2.

9

that this evidence demonstrated that Minden did not refrain from recording Fam's hold with AMCO to avoid interference with the Transfer Application.[64]

On January 25, 2018, the debtor's owners, Katherine Lemaster and Daniel Butts, entered their appearance in the bankruptcy case.[65] The same day, the debtor filed its opposition to Fam's Supplement. The debtor noted that Lemaster and Butts joined in opposition to the Application and argued that they had standing to object to the Application in light of its impact on the nondischargeable debt owed to the IRS.[66] The debtor also pressed its arguments that Minden and Fam willfully failed to record a hold on the License. The debtor contends that contrary to Minden's allegations the Transfer Application was never converted from an involuntary transfer to a voluntary one and believes that the failure to record a hold was not an "oversight."[67]

Finally, on January 26, 2018, Fam filed its Motion for Leave to File Supplemental Affidavit,[68] attaching an email exchange between Minden and AMCO director Erika McConnell. The debtor did not oppose the filing of the supplemental affidavit, but challenged the evidentiary significance of the email.[69] On March 22, 2018, this court entered its order granting the Motion for Leave to File Supplemental Affidavit, and took this matter under submission as of February 6, 2018.[70]

B.    ANALYSIS

   1.    **The Debtor and its Owners Have Standing to Challenge the Distribution Proposed by the Trustee.**

Fam has argued that the debtor and its owners have no standing to challenge the relief requested in the Application, citing cases in the claim objection context in support. Generally,

---

[64] ECF No. 47-1.

[65] ECF No. 48.

[66] ECF No. 49.

[67] *Id.* at pp. 1-2.

[68] ECF No. 50.

[69] ECF No. 51.

[70] ECF No. 52.

10

one has standing where he or she "meets constitutional and prudential standing requirements."[71] To prove constitutional standing, there must be "an injury in fact which is caused by or fairly traceable to some conduct or some statutory prohibition, and which the requested relief will likely redress."[72] "Prudential standing embodies judicially self-imposed limits on the exercise of federal jurisdiction."[73]

The initial objection to the Application was filed by the debtor alone.[74] On January 25, 2018 the debtor's owners, Katherine Lemaster and Daniel Butts, filed their notice of appearance in this matter,[75] and joined the debtor in its opposition to the Application.[76] The distribution proposed by the Trustee in the Application, and now agreed to by the IRS, would pay the IRS on a pro-rata basis with the other creditors deemed to have holds against the License. Such distribution would not discharge the debtor's outstanding federal tax debt in this bankruptcy case.[77] The debtor, and its owners, argue that the debt owed to the IRS must be treated as priority debt, and paid in accordance with § 507(a)(8) rather than pro-rata, and such treatment would pay a significant portion of the tax debt. The Trustee's proposed distribution sufficiently implicates the debtor's and its owner's interests to confer constitutional and prudential standing to challenge the proposed distribution.[78]

---

[71] *Veal v. American Home Mortgage Servicing, Inc., et al. (In re Veal)*, 450 B.R. 897, 906 (B.A.P. 9th Cir. 2011).

[72] *Id.* (citations omitted).

[73] *Id.* (internal quotations omitted).

[74] ECF No. 43.

[75] ECF No. 48.

[76] ECF No. 49.

[77] *See* 11 U.S.C. §§ 523(a)(1) and 727(a)(1). More importantly, Lemaster and Butts presumably would be personally responsible for any of the debtor's unpaid trust fund taxes under 26 U.S.C. § 6672(a). *See In re Cherne*, 514 B.R. 616, 621 (Bankr. D. Idaho 2014), *aff'd*, 2015 WL 5611586 (D. Idaho Sept. 23, 2015), *aff'd sub nom. Matter of Cherne,* 700 F. App'x 716 (9th Cir. 2017).

[78] *See Gilliam v. Speier (In re KRSM Properties, LLC)*, 318 B.R. 712, 716 n.3 (9th Cir. BAP 2004) (citations omitted) ("The standing of owners to object to claims in a corporate chapter 7 case, like the standing of chapter 7 debtors to object to claims in their own cases, depends upon whether they would be 'injured in

11

### 2.     Procedural Problems with the Sale and Distribution.

The instant motion is the latest attempt in this district to reconcile the State of Alaska's regulation of liquor licenses and the transfer of such liquor licenses held by a bankrupt debtor.[79] Alaska provides for the involuntary or voluntary transfer of liquor licenses.[80] Either process requires an application to AMCO,[81] notice to the debtor's creditors,[82] and approval from AMCO's board.[83] Those creditors holding debts arising from the operation of the liquor license may place a "hold" against the liquor license by filing a written statement that they are owed money from the holder of the liquor license arising from the conduct of the licensed business. AMCO will not approve a voluntary transfer of a liquor license unless these holds are paid.[84]

---

fact' by the allowance of the claim. This requirement is satisfied by cognizable prospects of receiving a distribution or of a nondischargeable debt being affected."); *In re I & F Corporation*, 219 B.R. 483, 485 (Bankr. W.D. Ohio 1998) (discussing *Mulligan v. Sobiech*, 131 B.R. 917, 919 (S.D.N.Y. 1991), where a chapter 7 debtor was found to have standing to object to a creditor's proof of claim in part because sustaining the objection "would make funds available to pay certain non-dischargeable claims").

[79] *Artus v. Alaska Dept of Labor, Employment Sec. Div. (In re Anchorage International Inn, Inc.)*, 718 F.2d 1446, 1449 (9th Cir.1983); *Stone v. State of Alaska Dep't of Rev.*, *subsequently aff'd in part, rev'd in part,* 6 F.3d 581 (9th Cir. 1993), and *overruled by United States of America v. Battley (In re Kimura)*, 969 F.2d 806 (9th Cir. 1992).

[80] AS 04.11.360 provides the terms and conditions that shall result in the denial of transfer of a license to another person. Under AS 04.11.360(4)(A) a request to transfer a liquor license shall be denied if the transferor has not paid all debts or taxes arising from the conduct of the business licensed under this title unless "(A) the transferor gives security for the payment of the debts or taxes satisfactory to the creditor or taxing authority; or (B) the transfer is under a promise given as collateral by the transferor to the transferee in the course of an earlier transfer of the license back to the transferee in the event of default in payment for property conveyed as part of the earlier transfer of the license." The retransfer of a license upon default of the terms of the transfer of that license is generally referred to as an involuntary transfer governed by AS 04.11.670 and 3 AAC 304.107 as well. *See also* Alaska Alcoholic Beverage Control Board Form AB-01 Transfer License Application (including "involuntary transfer" as designated type of transfer).

[81] *See* 3 AAC 304.105.

[82] *See* AS 04.11.280(b); 3 AAC 304.125.

[83] *See* AS 04.11.040(a).

[84] *See* AS 04.11.360(4)(A). Although the court is unaware of any reported decision that has considered an unpaid creditor's ability to prevent an involuntary transfer, a 1994 informal opinion of the Alaska Attorney General suggests that a local governing body may protest an involuntary transfer under AS 04.11.180(a) to achieve the same result. 1994 Alaska Op. Att'y Gen. (Inf.) 335 (1994). The right to protest

In theory, the transfer of a liquor license held by a bankruptcy debtor is no different than a transfer of a license outside of bankruptcy. However, not all creditors of the debtor may qualify for a hold against the liquor license, thereby altering the distribution otherwise required in a chapter 7 by § 726(a). Those creditors having a valid hold against a liquor license stand in a position equivalent to a secured creditor, as AMCO will not approve the transfer of the license absent resolution of those creditors' debts. Still, only those creditors that respond to AMCO's notice of a transfer, or have previously filed a written claim against the license, are entitled to a hold.

This court has long approved sales of liquor licenses recognizing creditors asserting holds against a liquor license and permitting payment of such holds from proceeds of the sale of the license. The Ninth Circuit examined a substantially similar version of AS 04.11.360(a)(4) in *In re Anchorage International Inn, Inc.*[85] Concluding that Alaska's statutory preference of certain creditors with holds did not violate federal bankruptcy law, the Ninth Circuit observed:

> The creditor of an owner of an Alaska liquor license, unlike the holder of a security interest or a mechanic's lien, cannot enforce the lien by self-help or by execution on the license. *See C.Y., Inc. v. Brown,* 574 P.2d 1274, 1277 (Alaska 1978). Nevertheless, the creditor's interest in the license is an encumbrance superior to the rights of others. The Alaska statute assures the liquor-related creditor that the sale of the license will not occur until his debt is paid or security satisfactory to him is provided. Other creditors whose debts are not related to the licensed business receive no similar assurances. Under Alaska law, the creditors of the liquor business do have a superior right to payment from the license sale proceeds. [footnote omitted]
>
> Although the lien interest created by Alaska Stat. § 04.11.360(4) differs in form from other more typical creditor-protection devices such as a security interest or a materialman's lien, all serve the same function. Regardless of its label, each encourages the extension of credit by providing that, upon the occurrence of

---

under AS 04.11.180(a) is limited to local governing bodies and does not provide a similar right to protest a transfer to other creditors.

[85] 718 F.2d 1446, 1449 (9th Cir.1983).

13

>certain conditions, the creditor has a priority right to payment from a particular asset.[86]

The distribution of proceeds from the sale of a liquor license, however, remain governed by the Bankruptcy Code, subject to the creditors' property rights created under Alaska law. Accordingly, a trustee administering a liquor license may disburse the proceeds from a sale of a liquor license approved by AMCO to creditors with valid holds against the license as they would to secured creditors. Such treatment recognizes the statutory priority imposed by AS 04.11.360(4), and upheld by the Ninth Circuit in *In re Anchorage International Inn, Inc.* Nonetheless, distribution to a specific creditor still depends upon the existence of a valid hold filed against the license being sold, or an order from AMCO under AS 04.11.360 conditioning the transfer of the liquor license upon payment to that creditor in recognition of such a hold.

In this instance there were no valid holds filed against the license at the time of the sale.[87] The Trustee attached Minden's unsigned AMCO affidavit to the Application to show those creditors with *potential* holds against the liquor license.[88] But, as part of Minden's involuntary transfer application AMCO sent notification to Aqua Pesca's creditors under AS 04.11.280(b) on May 25, 2017. The debtor's creditors could have placed holds on the License by returning the notification letter to AMCO with an asserted outstanding claim and/or objection to the License Transfer. None of the creditors to whom the Trustee proposes to distribute the Sale Proceeds returned the May 25, 2017 letters to AMCO, though one creditor stated that it did not place a hold on the License because it feared that such action would violate the automatic stay.

---

[86] The Ninth Circuit subsequently re-examined the same statutory scheme and the transfer of Alaskan liquor licenses in *In re Kimura,* 969 F.2d at 812, but held that "Alaska's statutory conditions for the transferability of a liquor license invalidly establish a property interest in trade creditors that violates the supremacy of a federal tax lien under federal law." In reaching its conclusion the Ninth Circuit noted that its decision in *In re Anchorage Int'l Inn, Inc.,* was limited to whether bankruptcy policy forbid Alaska from favoring one class of creditors from another and did not address a federal tax lien. *Id*. at 813.

[87] ECF No. 38 at 2 ("Surprisingly, no creditor filed a hold, with respect to the transfer of the License from the Trustee to Minden, prior to the transfer.").

[88] ECF No. 38 at p. 8.

The only holds actually filed with AMCO were received from Fam and the IRS on October 25, 2017, and November 14, 2017, respectively.[89]  Both were made well after the transfer of the License was approved by AMCO, and this court had approved the sale.  The Sale Order provided that "[t]he sale of the License is free and clear of the claims and liens of all creditors or other interested persons who received notice of the Motion.  Those claims and interests shall attach to the proceeds from the sale of the License *to the same extent and in the same order of priority as in the underlying License.*"[90]  Because no holds were filed before the License was transferred from the debtor to Fam, no holds attached to the proceeds from the sale of the License.

The Trustee proposes to distribute the net proceeds of the sale of the License to various creditors who have not filed holds, or who filed holds well after the sale.  Neither the Trustee, nor Fam, offer any analysis or argument to explain how unfiled potential holds, or those filed post-sale, attached to the sale proceeds.  For these reasons, the proposed distribution is not supported by § 726(a) because there is no evidence that the creditors identified in the Application had valid holds under Alaska law at the time of the sale of the License.  Therefore, the court must deny the Application.  A separate order shall be entered concurrently with this memorandum denying the Trustee's Application to Distribute Proceeds from Sale of Liquor License (ECF No. 38).

DATED: June 5, 2018.

BY THE COURT

 /s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Serve: C. Christianson, Esq.
       D. Bundy, Esq.
       E. LeRoy, Esq.

---

[89] ECF No. 43 at p. 8.  Neither of those holds have been submitted into evidence.

[90] ECF No. 34 at para. 4 [emphasis added].

15

R. Pomeroy, Esq.
S. Kelley, Esq.
K. Battley, Trustee
ECF Participants via NEF
P. Gingras, Financial Deputy
Case Manager

16